George L. DeBlois & another, trustees, *vs.* Boylston & Tremont Corporation & another.

.Stephen W. Sleeper & others, trustees, *vs.* Same.

John Roessle *vs.* Same.

Suffolk.    November 3, 1931. — January 12, 1933.

Present: Rugg, C.J., Crosby, Pierce, Wait, Field, Donahue, & Lummus, JJ.

*Contract,* Construction, Performance and breach, Modification, Consideration. *Agency,* Existence of relation, Scope of authority, Ratification. *Corporation,* Officers and agents, By-laws. *Broker.*

The respective owners of parcels of land in a city separated by a street, thinking that the title to the fee in the street was theirs subject to the easement in the public, by a contract in writing under seal agreed in substance to convey their land, including the street freed of any easement in the public, to a corporation, which intended to use it as one contiguous tract, deeds to be passed and accepted on a certain date if, among other conditions, the city then should "have. legally closed, abandoned and discontinued" the street and a certain title guaranty company should have filed with a bank, chosen by the parties as a depositary of the deeds and of a portion of the purchase price, a certificate that the deeds from "all the sellers . . . when recorded, will convey a good record and marketable title to the Buyer in the whole tract. . . ." The title guaranty company having discovered and reported to the parties that the city owned the fee in the street, negotiations followed for a conveyance of the street by the city to the purchasing corporation, a certain price to be paid to the city by the sellers, the purchasing corporation to make certain agreements as to the erection of a building of a specified character upon the premises within a stated time and a bond to the city guaranteeing

performance of that agreement to be furnished by the sellers for the corporation. Previous to the time fixed for performance of the contract of sale of the parcels, the president of the purchasing corporation, who had full authority to act for the corporation respecting the entire transaction, stated to an officer of the title guaranty corporation that he would not sign such an agreement with the city for his corporation and the officer of the title guaranty corporation therefore, not knowing of any modification of the original contract, issued a certification that the recording of the deeds held in escrow would "not vest in the purchaser a good record and marketable title in accordance with the requirements of said escrow agreements and the contracts of sale." The sellers, claiming a breach of the contract, brought suits in equity against the purchasing corporation and the bank depositary to require payment to them of the deposits. Upon an appeal from final decrees for the plaintiffs, where the record included all the evidence, it was *held*, that

(1) If the original contract in writing was modified by an oral agreement respecting the conveyance by the city and the conditions thereof and a communication of that fact by the purchasing corporation's president to the officer of the title guaranty corporation would have resulted in the certificate contemplated by the contract, the purchasing corporation would be estopped to deny that it had waived the filing of that certificate;

(2) If an oral agreement modifying the original contract in writing resulted from the negotiations with the city and was supported by a new consideration, the contract as modified became a new substituted contract;

(3) If the purchasing corporation made such new agreement, a sufficient consideration would be the agreement by the sellers to pay to the city the purchase price for the street or to furnish the bond the city required;

(4) The determinative question, therefore, was, did the purchasing corporation make the oral agreement modifying the original contract in writing;

(5) Findings by the trial judge that the sellers relied on a statement "that everything was all right and that the deal was going through" on the basis of such a modified agreement, made to them as coming from the purchasing corporation by one who had organized the purchasing corporation in behalf of a New York corporation, who represented himself as a broker and promoter in the transaction, and who expected to receive a large commission from the sellers and a bonus from the New York corporation, and that the sellers were justified in relying on such statement, were not warranted by the evidence, it appearing that they knew that such person was a promoter and knew of correspondence which plainly showed that he did not have an ostensible, imputed or express authority to represent the purchasing corporation in the matter;

(6) Knowing the promoter to be such, the sellers were obliged at their peril to ascertain his real authority respecting the negotiations as to modifying the agreement;

(7) Certain statements made by the vice-president of the purchasing corporation in the absence of the president and communicated to the sellers by the promoter were not within the vice-president's authority; by-laws of the corporation providing that he was vested with all the powers and required to perform all the duties of the president in his absence and that the president should have general control and management of the business, while giving the vice-president in the president's absence powers of a general manager, extended his power only to do things usual and necessary in the ordinary course of the corporate business; and the proposed modification of the original agreement was an unusual and extraordinary thing to be done and was not within such authority;

(8) It not appearing that the president of the purchasing corporation ever agreed to the modification of the contract in writing, or gave the sellers any ground for understanding that he did so, and no act of the promoter or of the vice-president with respect thereto having been authorized or ratified, the corporation could not be held bound to such an agreement for a modification;

(9) Since the purchasing corporation never by an agent having legal authority to bind it notified the sellers that it would accept the city's deed on the city's terms, it was justified in causing the title guaranty corporation to refuse a favorable certificate under the contract in writing;

(10) The purchasing corporation was entitled to a return of the deposit it made.

Another owner of land contiguous to that above described accepted an offer from the corporation to purchase his land and pay therefor if the corporation was able to obtain title to certain other parcels and to obtain from the city "a release of all its rights and interest" in the street above described so that it "can be closed and used by the" corporation "for building or any other purpose"; and a deposit was made of a portion of the purchase price. The corporation refusing to take title from such landowner, from the others and from the city, it was *held,* that the landowner was entitled to maintain a suit in equity requiring payment of the deposit to him.

THREE BILLS IN EQUITY, filed in the Superior Court on December 18, 1929, and described in the opinion.

The suits were heard together in the Superior Court by *Whiting,* J., a stenographer having been appointed under statutory provisions and the rule of court. Material evidence, findings and rulings by the trial judge and final decrees entered by his order are stated in the opinion. The defendant Boylston & Tremont Corporation appealed.

The case was argued at the bar in November, 1931, before *Rugg,* C.J., *Pierce, Wait, Sanderson,* & *Field,* JJ., and, after the death of *Sanderson,* J., was submitted on briefs to all the Justices.

*E. F. McClennen*, for the defendant Boylston & Tremont Corporation.

*R. G. Dodge*, (*H. W. Brown & R. A. Cutter* with him,) for the plaintiffs.

PIERCE, J. These cases are before this court on the appeals by the Boylston & Tremont Corporation (herein called the defendant) from final decrees against The Atlantic National Bank of Boston (herein called the bank) that the bank pay to the plaintiffs George L. DeBlois and another $300,000 and interest, to the plaintiff Stephen W. Sleeper and others $48,000 and interest, and to the plaintiff John Roessle $5,000. The three suits were tried together by the respective plaintiffs to recover the respective sums from the bank and temporarily to restrain the defendant from suing the bank therefor. The bills of complaint sought no judgment or other relief against the defendant. Answers and cross bills were filed by the defendant. These are not interpleaders' or stockholders' suits, although the bank is mainly interested in protecting itself against double liability. They in fact are suits whereby the several plaintiffs seek decrees against the bank only, based upon the obligations of these defendants to the plaintiffs. The plaintiffs in the first suit, under a declaration of trust, are owners of the Hotel Touraine property bounded by Boylston, Tremont, LaGrange and Tamworth streets, and of Touraine Annex, so called, on the opposite side of Tamworth Street between Lowell Court and LaGrange Street. The plaintiffs in the second case are trustees under the will of George F. Fabyan, deceased, and as such are owners of land on the southerly side of Boylston Street. The plaintiff in the third suit is or was the owner of a parcel of land on the northerly side of LaGrange Street.

On December 27, 1928, an agreement, under seal, was entered into between the plaintiffs in the first suit and the defendant for the purchase and sale of the Touraine property. On the same date a similar agreement under seal was entered into between the defendant and Francis W. Fabyan, Stephen W. Sleeper and Charles F. Adams, as trustees under an indenture of trust dated December 29, 1906, but

not individually, for the purchase and sale of a parcel of
land on the southerly side of Boylston Street. On Novem-
ber 21, 1928, the plaintiff in the third suit accepted a pro-
posal or offer of the defendant for the sale of certain property
on LaGrange Street.

The agreements of the plaintiffs in the first two cases
were made subject to escrow contracts of even date be-
tween the sellers, the buyer and the depositary. Each
escrow agreement recited in a preamble that the buyer
wished to acquire the whole tract, of which a full descrip-
tion was set out, together with its free and unrestricted use
as one contiguous parcel, not subject to any easement in
the public or others on account of Tamworth Street, Lowell
Court, or a certain passageway connected with Tamworth
Street, subject to the Boston zoning law, and to party wall
agreements of record relating to certain exterior boundaries
but free from all other restrictions except the Hotel Tou-
raine lease. It further recited that the buyer had entered
into an agreement with the sellers and with other sellers to
purchase the whole of the described tract, and that the
sellers to effect their respective sales were willing to petition ·
the city of Boston for the abandonment and discontinuance
of Tamworth Street. Part I of the escrow agreements re-
cited the deposit of $300,000 in the case of the DeBlois
agreement, and $48,000 in the case of the Sleeper agree-
ment, to be held "under and subject to the terms of this
escrow agreement." Part II of these agreements provided
that the sale and purchase agreements should be carried
out "If on or prior to ninety . . . days from the date
hereof (a) The Seller delivers to the Escrow Depositary a
deed which will convey when recorded a good record and
marketable title," (b) the "whole tract shall have been sur-
veyed for the Buyer at its own expense," (c) "The Sellers
of certain properties near the property . . . have . . .
deposited . . . deeds of the respective parcels," (d) "The
Trustees of the Young Men's Christian Union shall have
made available for record simultaneously with the other
deeds . . . either by depositing the same with the Escrow
Depositary or otherwise, a deed of the premises," covered

by the option granted by them, (e) "the City of Boston
shall have legally closed, abandoned and discontinued Tam-
worth Street" and "the rights of the public, if any, in said
Lowell Court shall have been eliminated," and that such
instruments with respect to Lowell Court and Tamworth
Street as are deemed necessary by Lawyers Title and Guar-
anty Company of New York shall be made available for
record, and (f) the Lawyers Title and Guaranty Company
shall also have filed with the escrow depositary a certificate
that the deeds from "all the sellers . . . when recorded,
will convey a good record and marketable title to the Buyer
in the whole tract . . . ." On the other hand, the agree-
ment provides that if these conditions be not performed then
"said attached agreement of sale and purchase shall be null
and void, and of no further force or effect, and the two
originals . . . shall be cancelled by the Escrow Depositary
and one returned to the Seller and one returned to the
Buyer," and that said $300,000 and said $48,000 paid as
deposits on said attached agreement of sale and purchase in
accordance therewith, together with interest at the rate of
three per cent per annum during such time as said deposits
"shall have been held by the Escrow Depositary, shall be
repaid by the Escrow Depositary to the Buyer, subject,
however, to the Buyer's election in" section "IV (b)" of
each agreement.

The sale and purchase agreement of the plaintiff John
Roessle came into existence as a legal obligation upon his
acceptance of a written offer of purchase from Mr. David
Stoneman, dated November 20, 1928, which was supple-
mented by a letter from him dated December 28, 1928.
By this acceptance Roessle agreed to sell his land for
$50,000 to the defendant and the defendant agreed to
pay Roessle for the property that sum if (1) "Upon the
acceptance by . . . [Roessle] of this offer, ten per cent.
. . . of the purchase price . . . will be deposited together
with this offer with . . . [a named bank] to be held in
escrow"; and (2) the defendant is able to obtain title to
the Touraine Hotel property, to the Young Men's Christian
Union property, and to the Fabyan Trust property, all

situated on Boylston Street, and to obtain from the city of
Boston a release of all its right and interest in Tamworth
Street, so that Tamworth Street can be closed and used by
the defendant for building or any other purpose. "Title
shall be delivered by a good and sufficient deed, free and
clear of all encumbrances."

The escrow agreements have attached to them the pro-
posed selling agreements and provided that if the condi-
tions named in those agreements were met the selling agree-
ments should go into effect, and if those conditions were
not met the proposed selling agreements should be null and
void. The agreement of the seller and buyer created by
the acceptance of the terms of the letter dated November
20, 1928, by Roessle, also became null and void if the con-
ditions there stated were not met. In either case if the
conditions were not met the depositary was by the terms
of the agreements or by legal implication bound to cancel the
proposed selling agreements and return the moneys to the
defendant. The cross bills are based on this alternative.
The record does not disclose that the bank ever modified
or agreed to the modification of the escrow agreements
deposited with it or to the conditions set down in the letter
to Roessle, dated November 20, 1928, the terms of which
were accepted by him on November 21, 1928.

In January, 1929, the Lawyers Title and Guaranty Com-
pany found that the fee to Tamworth Street was in the city
of Boston, whereas at the time of sale and purchase agree-
ments it was supposed by all parties in interest to be in
the adjoining landowners. In February, 1929, ten tax-
payers by suit sought to enjoin the street commissioners
from voting to discontinue Tamworth Street. Their peti-
tion was denied. See *MacDonald* v. *Street Commissioners*,
268 Mass. 288. The time fixed for the passing of papers
was extended by duly executed instruments to July 1,
1929, then to October 1, 1929, and finally to December 2,
1929. At last the city council passed a vote on October 28
and another on November 18, 1929, which were approved
by the mayor on November 19, 1929, to sell the Tamworth
Street property to the defendant for $100,000. By a con-

temporaneous vote the council apparently intended to make it a condition of the delivery of the deed, and the corporation counsel did make it a condition upon which the escrow depositary should make delivery of the deed, that the defendant should sign the agreement with the city to begin erection within three years of a mercantile or business structure containing a theatre with a seating capacity of not less than four thousand five hundred persons, to save the city harmless from all claims growing out of the discontinuance, and to furnish the city with a surety bond in the sum of $100,000 which should be conditioned upon the failure of the corporation to pay the city $100,000 as liquidated damages if the agreement was not performed.   Mr. Saul E. Rogers, president, treasurer and director of the defendant and the record owner of ninety-eight shares of its capital stock out of one hundred shares outstanding, was also vice-president and general counsel for the Fox Theatres Corporation.   He told Mr. J. M. Davidson, the Lawyers Title and Guaranty official in charge of the question of the title certificate required by the escrow agreement, that he would not sign the agreement with the city.   This was a few days before December 2, 1929.   It was for this reason, Mr. Davidson testified, that on December 2, 1929, he filed a certificate which so far as material reads: "We hereby certify to you [The Atlantic National Bank of Boston] that our representatives have examined the proposed deeds and resolutions and proceedings in connection therewith which said deeds are in your hands as escrow depositary under escrow agreements dated December 27th and December 28th, 1928, and in our opinion the recording of same will not vest in the purchaser a good record and marketable title in accordance with the requirements of said escrow agreements and the contracts of sale."   As respects this certificate the judge in the Superior Court found that Mr. Davidson knew of no modification or variation of the original contract in the way of an agreement imposing a certain condition upon the delivery of the city's deed and that he had no further information about it except Mr. Rogers's statement that he would not sign the

agreement.   He further found "that the failure to file a favorable certificate was not due to fraud or bad faith on the part of the Lawyers Title and Guaranty Company," and "that the Lawyers Title and Guaranty Company could not truthfully certify that the deeds from all the sellers except the city of Boston would convey a good record and marketable title in Tamworth Street to the buyer free from all encumbrances so that the tract might be used by the buyer for building or other purposes but could have so certified if the deed from the city of Boston had been delivered to the buyer."   At the appointed time and place for passing papers on December 2, the defendant refused the tender made by the sellers.   Almost at once the latter made a demand upon the escrow depositary to pay over the initial payment. Bills in equity were brought to enforce the demand.   Hearings were held and in findings of fact the judge made various rulings which led to a decree that the sellers were entitled to the initial payments.

The sale and purchase agreements by the terms of the escrow agreements were to be in full force and effect if the Lawyers Title and Guaranty Company filed a certificate that the sellers' deeds when recorded would convey a good record title to the whole tract including the fee to Tamworth Street.   But if a certificate was filed, as did happen, that these deeds would not convey such a title, then the purchase and sale would be of no effect and void.   At the trial and at the hearing before this court the plaintiffs contended that Mr. Davidson's complete lack of knowledge of the modification of the escrow agreements and his erroneous assumption that there had been no modification of those agreements constituted a mistake so palpable as to prevent the arbitrator from exercising his judgment upon the matter submitted to him.   In support of this second position the plaintiffs cite and rely upon *Morgan* v. *Murdough*, 216 Mass. 502.   It is plain that on the facts that case is not applicable.   There the question was whether the plaintiffs were or were not obligated under a building contract to do certain work, the costs of which the defendant was seeking to set off against the plaintiffs' claim.   The architect

attempted to decide the true meaning of the contract. The court decided that he did not have such power under the provision that the architect shall be referee in all cases to decide upon the quality, acceptableness and fitness of the several kinds of work.   In the case at bar if the certificate be disregarded there remains a condition precedent to absolute liability unperformed, and still in an executory stage.   Since the contract was executory there could be no equitable grounds for the court to disregard the lack of a certificate or to imply further terms to force an obligation on the defendant.   This fact also distinguishes the case from *Hurley* v. *Boston*, 244 Mass. 466, cited in support of the proposition that because Mr. Davidson acted under a mistake, his certificate might be set aside.   *Marsch* v. *Southern New England Railroad*, 230 Mass. 483.   *Clark* v. *New England Telephone & Telegraph Co.* 229 Mass. 1.   In *Palmer* v. *Clark*, 106 Mass. 373, 389, it is said that "To avoid it, the mistake must be one which shows that . . . [the party] was misled, and so far misapprehended the case that he failed to exercise his judgment upon it. . . ." The plaintiffs, however, in addition contend that the certificate was procured wholly by what the defendant, acting through Mr. Rogers, caused to be done, that is, if the truth about the arrangement with the city, including the collateral agreement, had been told Mr. Davidson by Mr. Rogers the plaintiffs would have had a favorable certificate.   If the statement of the defendant's president when he should have spoken of the modified agreement would have resulted, as the plaintiffs contend, in a certificate such as was contemplated by parties to the agreements of sale and purchase, it would follow through the doctrine of estoppel that the defendants would be held to have waived the filing of a certificate of title as a condition precedent to their liability and would be bound by the sale and purchase agreements notwithstanding there was an absence of such certificate.   *Mansfield* v. *Hodgdon*, 147 Mass. 304.

The next issue is, Did the defendant consent and agree to a modification of the escrow agreement?   The solution of this issue determines the answer to the question, Was

there a sufficient tender by the deeds of the sellers offered in combination with the deed of the city conditioned as described below? The trial judge found and ruled "that what the landowners did was a sufficient tender under the terms of the agreements of sale and purchase and the escrow agreements as modified . . . and that the deeds tendered at the meeting of December 2, 1929, with the deed of the city of Boston would, if recorded, have vested in the purchaser a title free from all encumbrances, except those referred to in the agreements, which would prevent the purchaser from building on or using said entire tract as one contiguous parcel, subject to the zoning laws of the city of Boston." The vital point is, Did the defendant ever agree to a modification of the original contract and to an acceptance of the deed of the city upon the conditions imposed therein? Unless it did so agree it had a right to refuse to sign the agreement, and the defendant's exception 63 to the ruling, "The failure of the Lawyers Title and Guaranty Company to give a favorable certificate is not a bar to the recovery by the plaintiffs," should be sustained except as applied to the deed proffered by Roessle.

Relative to the title to Tamworth Street and to the modification of the agreements dated December 27, 1928, the judge found on the facts "that no written modification of these agreements was executed by any of the landowners or the defendant." In this connection it is to be noted that the statute of frauds is not pleaded by the defendants.

It is settled law that an executory, bilateral written contract may be varied by a subsequent oral agreement between the parties, that the contract when modified by the subsequent oral agreement is substituted for the contract originally made, and that the substituted contract is supported by the bilateral obligation of the substituted contract, if there be such, and by the consideration of the original contract. *Thomas* v. *Barnes*, 156 Mass. 581, 584. The trial judge found that "from February, 1929, the parties concerned understood that it would be necessary to get a deed to Tamworth Street from the city of Boston; that from then on the landowners and the defendant coöperated

in an endeavor to obtain this result upon conditions satisfactory to the defendant and the city of Boston; that the defendant finally notified the landowners and the city that it would accept the terms on which the city offered the deed to Tamworth Street; that these terms were agreeable to the landowners, were accepted by them and that this operated to modify the agreements dated December 27, 1929 [1928?], to that extent." But a sufficient consideration is necessary to bind such a modification of the original agreements as was here contemplated. Speaking of the elements of rescission of parol agreement it is said in § 1826 of Williston on Contracts, " 'a subsequent contract completely covering the same subject-matter, and made by the same parties, as an earlier agreement, but containing terms inconsistent with the former contract, so that the two cannot stand together, rescinds, substitutes, and is substituted for the earlier contract and becomes the only agreement of the parties on the subject.' But the subsequent agreement must have sufficient consideration. Therefore if the undertaking by one party is simply to perform the whole or part of what he promised in the original contract, it will not support a promise by the other party to perform what he had previously agreed and something more. Nor . . . can an existing contract be altered by mutual assent by an agreement merely to give one party a right or privilege, or subject the other party to a burden which he did not have previously." It follows that if the defendant merely agreed to take the city's deed on the proposed terms there would be nothing to bind such agreement. But assuming that it can be found to be a part of the defendant's plan of modification with the sellers that the sellers would put up the purchase price for the fee to the whole street or furnish the bond required by the city, then a consideration is found.

If the parties supposed, as they did until 1929, that the fee to Tamworth Street was in the abutting owners, then the trustees of the Touraine property were not obliged to convey that part of Tamworth Street that was in the trustees of the Boston Young Men's Christian Union. To determine the question whether the defendant agreed to a

modification of its original agreement it is necessary to consider the parts played by various persons in connection with this case.

The trial judge found that the defendant corporation from November 20, 1928, when it was organized, down to and including December 2, 1929, was created and maintained for the sole benefit of and was absolutely controlled and dominated by the Fox Theatres Corporation. The history of the events leading up to the formation of this corporation is as follows: In October, 1928, Alexander Kempner, head of the real estate department of the Fox Theatres Corporation, met at his office in New York City Mr. David Stoneman accompanied by two real estate brokers of Boston. Kempner told them that the Fox Theatres Corporation expressly desired a site for a theater and office building, in Boston, and discussed the availability of the Hotel Touraine site. He later telephoned Mr. Stoneman, in Boston, and said that, after conference with Fox along the line of their discussion, Fox had come to the conclusion that he would prefer to have his company buy or build a theater or office building for itself, in lieu of leasing one. A few days later he authorized Mr. Stoneman to assemble the lots of land involved in this suit, a payment of $4,400,000 being contemplated. "At this time the owners of the properties to be purchased had not been approached and knew nothing of the proposed transaction." Mr. Stoneman's commission for his services was to be one third of the regular broker's commission, to be paid by the landowners. It was agreed between Mr. Stoneman and Mr. Rogers that if the transaction were consummated, Mr. Stoneman should be paid $75,000 for his fees and expenses, and for all other incidental work the Fox interests would have in Boston in connection with the enterprise. Mr. Stoneman and the real estate broker thereupon commenced negotiating with the real estate owners. Kempner sent an associate, one Goldstein, to Boston with instructions to have Mr. Stoneman acquaint him with the location, the owners, all details, surveys, building plans, building laws and the like. Thereafter Mr. Stoneman, at the request of Goldstein and Kemp-

ner, formed the defendant corporation under the laws of the
Commonwealth of Massachusetts.   The incorporators were
all employees in the office of Mr. Stoneman, as were the
stockholders, officers and directors.   Nothing was paid for
the capital stock during the time Mr. Stoneman controlled
the corporation.   By November, 1928, the project had ad-
vanced to such a stage that Kempner informed Mr. Stone-
man that Mr. Rogers should be brought into the matter to
look over the legal and other aspects of the situation, and
Mr. Stoneman went to New York and outlined the subject
to Mr. Rogers.   On December 27, 1928, the directors of the
Fox Theatres Corporation, all the directors being present,
or having waived notice, voted "that Saul E. Rogers . . .
be . . . authorized to take whatever steps in his judgment
may be necessary or expedient to acquire the said properties
upon such terms as he may deem fit and proper and that said
plot may be acquired in the name of the Boylston & Tremont
Corporation."   It was then voted that Mr. Rogers be author-
ized to sign and execute on behalf of the Fox Theatres Cor-
poration such documents, contracts or promissory notes of
the company as might be necessary or required for the pur-
pose of carrying out said transactions.   It was also voted
that Mr. Rogers be authorized and empowered to open a
bank account in The Atlantic National Bank of Boston in
the name of the Fox Theatres company and to open and
establish a bank account in the name of the defendant, and
that he be authorized and empowered to sign and indorse
any and all checks to be drawn in either of said bank accounts.

The purpose for which the defendant corporation was
formed as stated in general in the agreement of association,
is "To acquire by purchase . . . or otherwise, lands or any
interest therein; to erect and construct houses, buildings
or works of every description . . . and generally to deal
with and improve the property of the company."   Art. XII
of the by-laws reads: "The property and business of the
Company shall be managed by the Board of Directors who
shall be chosen annually from the common stockholders and
shall hold office until others are chosen and qualified in their
stead."   Art. XVII reads: "The board of Directors shall

have the management of all business of the Company."
By December 27, 1928, the escrow agreements above re-
ferred to in the first two cases, respecting $300,000 and
$48,000, respectively, to be held by the depositary, had been
prepared, given to Mr. Rogers, and examined thoroughly
by him.   On December 28, 1928, the directors and officers
of the defendant resigned and all stockholders transferred
their stock to the defendant which consented that ninety-
eight shares be transferred to Mr. Saul E. Rogers, one share
to Mr. Reginald L. Robbins, and one share to Mr. Waldo
Noyes.   These three were elected directors, and Mr. Rogers
was elected president and treasurer, Mr. Robbins, vice-
president, and Mr. Noyes, clerk.   The stock ownership has
remained the same and the officers and directors have con-
tinued to serve from that day to and including the date of
the filing of the bills in equity.   The stockholders of the
defendant then voted to enter into the agreements of sale
and purchase, hereinbefore referred to, and the directors were
"authorized to make whatever arrangements, and authorize
whatever acts on behalf of the corporation may be necessary
or advisable to accomplish the purchase of said property,
on the conditions and terms outlined in said papers" which
had been read at the meeting.   At a special meeting held
shortly thereafter the directors voted to purchase the real
estate described in the stockholders' vote on all the terms and
conditions therein set forth "and as set forth in the agree-
ment of sale and purchase, escrow agreements, and options
which are attached to the minutes of the stockholders' meet-
ing, and that Saul E. Rogers, acting as President and Treas-
urer of the corporation, be and hereby is authorized in the
name and on behalf of the corporation to affix the corporate
seal, and to sign and acknowledge all such agreements,
instruments or documents of whatever nature, as may be
necessary to accomplish the purchase of said real estate, and
to pay from the funds of the corporation such sums as may
be necessary for the purchase thereof."   On December 28,
1928, the various parties met and the several instruments
above referred to were executed and option left with the
escrow depositary.   The trial judge finds no vote of the

stockholders or directors authorizing Mr. Robbins to make an agreement with the city.

Upon all the evidence reported and upon the facts specially found by the trial judge, it is clear that Mr. Rogers was fully authorized to speak for both the defendant and the Fox Theatres Corporation in connection with the terms upon which the Tamworth Street property was to be acquired. With respect to Mr. Stoneman's position as a representative of the Fox Theatre interests and of the defendant, the trial judge was warranted by the evidence in finding that his position in these transactions "was somewhat anomalous." He states that "When these transactions commenced . . . [Mr. Stoneman's] position was that of a broker or promoter and he was to be paid for his services by a commission from the landowners if, and when, the transaction was consummated, although he was first employed by the Fox Theatre interests to obtain the properties." Mr. Stoneman was also employed by the Fox Theatre interests to attend to the passage of votes through the city government or various departments and other matters of various kinds. "Mr. Stoneman was in fact authorized by the officials of the Boylston & Tremont Corporation to handle the negotiations with the city in respect to Tamworth Street except that he was not authorized to finally determine the terms on which the fee of Tamworth Street was to be acquired and that what he did in that matter was authorized except in respect to the offer contained in the letters of September 13 and 28, [1929] to the mayor." The trial judge further states: "Neither Mr. Rogers nor Mr. Robbins notified the city authorities that the offer contained in the letters of Mr. Stoneman to the mayor of September 13 and 28 was unauthorized. I find that they ratified it by their action so far as the city was concerned, that the city authorities were warranted in believing that the acts of Mr. Stoneman relative to the Tamworth Street matter were within his apparent and ostensible authority as acting for the Boylston & Tremont Corporation, except that the terms of the arrangement with the city were to be ratified by the Fox Theatre interests in New York and

that they did so believe." Respecting the authority of Kempner, vice-president of one of the three organizations maintained by the Fox interests, and head of the real estate department of the Fox Theatres Corporation, the evidence warranted a finding that, because of his position, he had authority to speak for the Fox interests and through them for the defendant, or, if not, that what he did representing the Fox Theatres Corporation was subsequently ratified by Mr. Rogers as executive head of the defendant. Respecting the authority of Mr. Robbins, a vice-president of the defendant, the trial judge found that on December 8, 1928, Mr. Robbins was retained by Mr. Rogers "to represent the Fox Theatre interests and the Boylston & Tremont Corporation in Boston in connection with the proposed development." He .had represented the Fox Theatre interests before but was employed at the time to attend to the strictly legal phases of the situation and represent the corporation in court matters. As vice-president, in the absence of the president, he had great authority under the by-laws.

The trial judge found that when the transaction commenced the position of Mr. Stoneman was that of broker or promoter, and as matters progressed he was employed to represent the Fox Theatre interests. While Mr. Stoneman was speaking to the city council on October 11, 1929, in the presence of the sellers he stated that his position was that of a promoter of the project. If Mr. Stoneman was a broker or promoter he was without authority to bind his principal beyond the terms of the specific authority conferred on him and those dealing with him had to ascertain the bounds of his authority at their peril. *Snow* v. *Perry*, 9 Pick. 539. *Mussey* v. *Beecher*, 3 Cush. 511. *Stollenwerck* v. *Thacher*, 115 Mass. 224. *Norton* v. *Nevills*, 174 Mass. 243. *Harrigan* v. *Dodge*, 216 Mass. 461. The trial judge found that while Mr. Stoneman was in fact authorized by officials of the Boylston & Tremont Corporation to handle the negotiations with the city in respect to Tamworth Street, he was not authorized finally to determine the terms on which the fee of Tamworth Street was to be acquired. After Mr. Stoneman on September 28, 1929, wrote the mayor making

an offer for Tamworth Street, he conferred with Mr. Rogers as to this offer. Mr. Rogers was much concerned that the offer was made in the name of the defendant, but upon consideration of all that had been done to date and of the amount of money that would be needed to carry it through, said to Mr. Stoneman: "All right, I guess we can do it all right. You go ahead and get ready . . . and we [the Fox Theatre interests and the defendant] will be ready also." The plaintiffs contend in their brief, in substance, that this was a broad ratification of the offer contained in the letter of September 28, 1929; that the authority thus given to "go ahead and get ready" was never revoked; and that this authority "included the authority to make the much more favorable arrangement in fact made by Mr. Stoneman under which, if the building were not built, the defendant would have retained the land to use as it saw fit without incurring any obligation, either legal or moral, to the city in this respect"; and further contend that this evidence alone would have justified the judge in finding that the defendant authorized and consented to the final arrangement which Mr. Stoneman made with the city. But the authority conferred upon Mr. Stoneman by Mr. Rogers was essentially specific, directed to the doing of a specific act. He could bind the defendant only by such a contract as it had authorized him to make. *Brown* v. *Henry*, 172 Mass. 559, 566. The authority given Mr. Stoneman was to go ahead with the agreement presented in the letter of September 28, 1929. The trial judge found that Mr. Stoneman did not confer nor communicate with Mr. Rogers between October 3 and November 19, 1929. On October 15, 1929, Mr. Rogers left New York on a hunting trip and could not be reached until October 28, 1929. He heard nothing relative to the transaction between those dates. About October 19, 1929, and before, "the whole negotiations were on the basis of putting a condition in the deed or executing another agreement to reconvey if the theatre was not built." At that time "The idea of a conditional deed or an agreement to reconvey was abandoned." At a meeting held in the offices of the city law department on October 21, 1929, the assist-

ant corporation counsel submitted two orders, which he proposed should be presented to the city council, one to sell Tamworth Street fee for $100,000, and the other for an agreement between the defendant and the city that the defendant would build a building of a certain value, of a certain number of stories and of a certain seating capacity within two years, secured by a surety bond of $200,000. Mr. Robbins and Mr. Stoneman alone represented the defendant and the Fox Theatre interests. In the absence of Mr. Rogers, Mr. Robbins wanted to get the "Fox people in New York to approve" of the proposed collateral agreement. On the same day Mr. Robbins telephoned to Mr. Rogers's secretary and was informed by her that she had "spoken with Mr. Fox and that Mr. Fox had said very positively that he would not enter into a collateral agreement with the city; that he would accept nothing but full title to the property." Mr. Robbins then said to Mr. Stoneman that Fox would accept nothing but full title to the property and that "he would not be a party to allowing the orders to go through, in face of such positive instructions from New York." This discussion was reported by telephone to the assistant corporation counsel and it was arranged to have the matter go over to November 4, 1929, pending Mr. Rogers's return. On November 6, 1929, after the stock market collapsed, Mr. Robbins saw Mr. Rogers in New York. Mr. Robbins showed all the papers to Mr. Rogers including the transmitted letter of Mr. Stoneman of October 30, with the attached documents, and they examined them together. Mr. Robbins pointed out that the deed was unconditional. Until this meeting Mr. Rogers had no knowledge of the arrangement made with the city as set forth in the orders passed by the city council, which were approved by the mayor on November 19, 1929. Before October 28, 1929, when the orders took their first reading in the city council, Mr. Rogers, Fox or Mr. Robbins had not indicated any approval of the substance of the transactions nor receded from the objections already expressed, but expected to have the matter await Mr. Rogers's decision on his return. The orders were prepared by the law department

and were submitted by the mayor to the city council without Mr. Robbins's knowledge. On November 7, the day after he saw Mr. Rogers, Mr. Robbins saw Mr. Stoneman relative to his conference with Mr. Rogers. Mr. Stoneman asked Mr. Robbins if he thought the collapse of the stock market was going to affect the transaction. Mr. Robbins replied: "No, I don't think so," and further stated that in his own judgment "everything is all right and things will go through." "After the conference of November 7 with Mr. Robbins, Mr. Stoneman conferred with the several landowners, told them that everything was all right and that the deal was going through." The trial judge found that the landowners relied on this statement and were justified in so doing.

The finding by the trial judge that the landowners relied on the statement of Mr. Stoneman was not justified by the evidence. The sellers knew that Mr. Stoneman's interest was in one third of the broker's commission to be paid by the plaintiffs and in the contingent compensation to be paid by Fox Theatres Corporation. They knew that his position primarily was that of a promoter; that he could not bind the defendant to do anything; and that anything he did was done to enable the plaintiffs to perform their agreements of sale. The landowners were the ones who petitioned for the discontinuance of Tamworth Street and they were the ones who agreed to acquire from the city the fee of Tamworth Street. Before Mr. Stoneman made the city an offer for this land he had arranged with the plaintiffs for the purchase by them with their money. No one other than the plaintiffs had authorized the offer. The plaintiffs were notified that the defendant did not know that any offer was being made in its name. On October 11 and October 30, 1929, by letters dated October 4, 1929, from the plaintiff DeBlois and the plaintiff Sleeper, respectively, addressed and delivered to the Tremont & Boylston Corporation, the sellers declared that the "negotiations in the name of the Boylston and Tremont Corporation have been without authority. . . . Mr. Stoneman's action is really a short cut for the benefit of the

landowners. . . . the permission granted by you [Boylston & Tremont Corporation] to allow this offer before the City Government to stand as it is, is without waiving any rights, remedies or objections which you would otherwise have as to the title to Tamworth Street . . . the offer made by Mr. Stoneman in the name of the Boylston & Tremont Corporation is to be construed in our relations as an offer made by landowners and not an offer made by the Fox interests or the Boylston & Tremont Corporation." "We, accordingly, request you to adopt the situation." With this explicit notice and with their actual knowledge as shown by this letter, it could not warrantably be found as a fact that Mr. Stoneman had an ostensible, imputed or express authority to represent the defendant at the preliminary hearings before the mayor or during the passage of the orders in the city council. Furthermore, knowing Mr. Stoneman to be a broker, the sellers were obliged to ascertain his real authority at their peril. *Coddington* v. *Goddard*, 16 Gray, 436, 445. Under the votes of the Fox Theatres Corporation and of the directors of the defendant at a meeting held December 28, 1928, Mr. Rogers plainly had authority to consent to the modifications of the original agreements and to execute the collateral agreement. The provision as to liquidated damages does not necessarily exclude specific performance. *Diamond Match Co.* v. *Roeber*, 106 N. Y. 473. The question is to be determined according to the intent of the parties. But it is immaterial whether Mr. Rogers had or had not such authority, for he never exercised it. It was not until November 6, 1929, that Mr. Rogers in his conference with Mr. Robbins learned of the terms of the proposed arrangement with the city, and he testified that he never said to any one that the defendant would enter the arrangement set forth in the city council votes. The judge might have disbelieved this testimony, but his disbelief would not be affirmative proof of the opposite. *Laidlaw* v. *Vose*, 265 Mass. 500, 505. *Guinan* v. *Famous Players-Lasky Corp.* 267 Mass. 501, 519. Mr. Rogers by a telegram dated November 13, 1929, declined to commit himself to any such plan. He said that he had

not received any definite answer from his bankers and that no definite answer could be given until he did.  From the letter dated November 7, 1929, from Mr. Robbins to Mr. Rogers, it is plain that it was well understood that Mr. Rogers had not agreed and could not agree to the terms of the modified agreement unless and until he had the approval of his bankers, and it is plain and uncontradicted that Mr. Rogers at the conference on November 19 and November 29, 1929, reiterated that he was in no position to discuss the Boston situation.  The trial judge found that at the conference of November 19 and November 29, 1929, "not a word of dissatisfaction or comment on the terms of the trade was made nor did Mr. Rogers raise any objection to signing the collateral agreement with the city.  Between October 24, 1929, and the meeting on December 2, 1929, neither Mr. Rogers, Kempner nor Mr. Robbins stated to Mr. Stoneman or any of the landowners that the agreement with the city was unsatisfactory to the Fox Theatre interests or that the purchaser would not sign the agreement.  Apart from the suggested eminent domain amendment the only statements of unwillingness on the part of the defendant to complete the transaction related to financial difficulty on its part.  Prior to the meeting of December 2, Mr. Stoneman never heard any suggestion of any sort that there was anything in connection with the final agreement with the city that had not been agreed to or authorized.  I find on all the evidence and the inferences to be drawn therefrom that the defendant notified the plaintiffs and the city authorities that it would accept the terms on which the city offered the deed of Tamworth Street."

As respects the authority of Mr. Robbins to act for the defendant, the trial judge found that "There was no vote by the directors or stockholders of the Boylston & Tremont Corporation prior to December 2, 1929, authorizing Mr. Robbins to act for it.  He was not authorized to make real, substantial changes in the contracts of purchase and sale or the escrow agreements without consulting the Fox Theatre interests in New York . . . . that Mr. Robbins neither said nor did anything that he was not authorized

to do either by reason of his being the vice-president of the Boylston & Tremont Corporation and the president being absent, or because of prior authorization or subsequent ratification by Mr. Rogers . . . that Mr. Rogers requested Mr. Stoneman not to tell Mr. Robbins of his employment by the Fox Theatre interests or the Boylston & Tremont Corporation; that Mr. Stoneman never told Mr. Robbins of this employment; that Mr. Robbins did not know of Mr. Stoneman's employment until some time after he had been so employed; that at some later time Mr. Rogers told Mr. Robbins of Mr. Stoneman's employment . . . that Mr. Robbins did not know, nor was it intended that he should know, all of the things that Mr. Stoneman was doing really for the benefit of the Fox Theatre interests or the Boylston & Tremont Corporation but ostensibly for the landowners." On all the evidence we think the trial judge was warranted in concluding that Mr. Robbins, as vice-president, was not authorized by virtue of his office to accept the proposal of the city, and it is not controverted that Mr. Rogers never authorized the statements made by Mr. Robbins or that, in fact, he ever knew that they had been made by Mr. Robbins. As vice-president of the defendant corporation Mr. Robbins had no authority to make the statements attributed to him. One of the by-laws provided that such officer should be vested with all the powers and required to perform all the duties of the president in his absence. Another by-law provided that the president should have general control and management of the business; under such a by-law the officer named has the powers of a general manager — they are not unlimited, *Treasurer & Receiver General* v. *Macdale Warehouse Co.* 262 Mass. 588 — the power extends to doing anything which is usual and necessary in the ordinary course of the corporate business. See *England* v. *Dearborn,* 141 Mass. 590. We think the proposed modification of the original agreement was an unusual and extraordinary thing to be done and was not within the authority conferred upon the vice-president by the corporation. Consequently, the statements of Mr. Robbins are not binding on the defendant, and they fall into the

general rule that only those acts, declarations and admissions are binding on the principal which are within the scope of the agent's authority. *Amory* v. *Amherst College,* 229 Mass. 374, 392. *Treasurer & Receiver General* v. *Macdale Warehouse Co.* 262 Mass. 588, 592. Upon the evidence it was not reasonably possible to find that the defendant through the authorized acts of Mr. Stoneman, Kempner, Fox or Mr. Robbins ever made a binding agreement "to begin the erection of, within three years . . . a mercantile building or structure containing a theatre with a seating capacity for not less than 4,500 persons; and . . . to furnish the said City of Boston with a surety company bond in the sum of One Hundred Thousand Dollars." In the opinion of a bare majority of the court the conclusion is that the defendant never by an agent having legal authority to bind it notified the plaintiffs that it would accept the city's deed on the city's terms; that the defendant, if it caused the Lawyers Title and Guaranty Company to refuse a favorable certificate, was justified in so doing on the evidence. Hence the unfavorable certificate entitles the plaintiff in the cross bill to recover the deposit on the DeBlois and Sleeper agreements. No question is raised as to the option given by the Boston Young Men's Christian Union by any party to these proceedings.

As regards the case of John Roessle, it appears that he did not sign and was not bound by the escrow contracts to which the other plaintiffs were subject. The defendant's offer to him was conditional on its ability to obtain title to the Touraine, Boston Young Men's Christian Union and Fabyan properties, and its ability to obtain from the city a release of all rights in Tamworth Street so that that street could be used for building or any other purpose. The defendant, if it desired, could have obtained title in the manner contemplated at the time of this agreement. The decree in favor of John Roessle must be affirmed.

In the view we have taken of the disposition to be made of these cases it is unnecessary to determine whether the agreement under seal of the trustees under the indenture would be satisfied by a conveyance of the same land under

a deed of different trustees under the will of George F. Fabyan.

About eighty exceptions have been saved in the record — first to the admission of conversations contended to be inadmissible against the defendant; second, to the exclusion of evidence of expressed lack of authority; third, to certain findings on the ground that they are not warranted by the evidence; and fourth, to the rulings of law made on the facts found. We have examined those argued and treat the others as waived. *Guinan* v. *Famous Players-Lasky Corp.* 267 Mass. 501, 519.

It results that the final decree in the suit brought by George L. DeBlois *et al.* is reversed; that the final decree in the suit brought by Stephen W. Sleeper *et al.* is reversed; that the final decree in the suit brought by John Roessle is affirmed with costs; and that a final decree is to be entered adjudging and decreeing that The Atlantic National Bank of Boston now holds said deposit of $300,000 and the said sum of $48,000 in trust for the sole benefit of the defendant corporation; and that The Atlantic National Bank of Boston shall forthwith pay over said sums with interest at one and one half per cent per annum from December 2, 1929, to the date of payment and shall pay to the defendant corporation a sum equivalent to interest at three per cent per annum on $300,000 from December 27, 1928, to December 2, 1929, and likewise on $48,000 from December 27, 1928, to December 2, 1929, after deducting therefrom for its expenses and charges a sum in each case to be determined in the Superior Court; and it is further ordered, adjudged and decreed that the defendants in the cross bills, George L. DeBlois *et al.* and Stephen W. Sleeper *et al.* shall pay to the plaintiff costs to be taxed in the Superior Court, and that thereupon and therefor execution shall issue forthwith.

*Decree accordingly.*