MASSACHUSETTS HOSPITAL LIFE INSURANCE COMPANY *vs.*
ISRAEL NESSON & others.

Suffolk.    January 8, 9, 1934. — April 6, 1934.

Present: RUGG, C.J., PIERCE, WAIT, FIELD, & LUMMUS, JJ.

*Corporation,* Officers and agents. *Agency,* Scope of authority. *Bills and Notes. Equity Pleading and Practice,* Bill, Decree.

Evidence, offered by the defendant at the trial of an action by an insurance company upon a promissory note secured by a mortgage of real estate, that an officer of the company, "who held the position of actuary, which is the name that was given to its chief executive officer — it might be that other companies would call it general manager or president — but in that company he is known as the actuary," agreed with the defendant that, if he at his expense would make certain improvements on the real estate and would pay a certain amount on the note, the company would release him from personal liability upon the note; that the defendant made such improvements and payment; and that he had had other dealings with the company, always through the actuary, there being no evidence of express authority in the actuary to make such agreement, would not warrant findings that the actuary had actual or ostensible authority to make such agreement of release or that the company was bound thereby.

A contract to pay interest at a rate higher than that stated in a promissory note cannot be enforced in proceedings upon the note without appropriate allegations respecting such a contract in the plaintiff's pleadings.

BILL IN EQUITY, filed in the Superior Court on December 7, 1932, and described in the opinion.

Issues were framed for trial by jury. Proceedings at that trial before *Donnelly,* J., are described in the opinion. After a further hearing by *Greenhalge,* J., a final decree described in the opinion was entered. The defendants Israel and Eva M. Nesson alleged an exception saved at the trial by jury, and appealed from the final decree.

In this court the defendants raised no question as to procedure.

*P. Nichols,* (*S. H. Lewis* with him,) for the defendants.
*R. Clayton,* (*D. Stoneman* with him,) for the plaintiff.

PIERCE, J. This is a bill in equity whereby the plaintiff seeks to establish the liability of the defendant Israel Nesson on two promissory notes signed by him as maker — one dated October 17, 1898, in the sum of $80,000, upon which there is now due $52,000 with interest; the other dated June 28, 1917, in the sum of $36,000, the whole of which is now due with interest. The bill also seeks to reach and apply certain property alleged to be owned by the defendant Israel Nesson but to be standing in the name of the other two defendants.

The defendant Israel Nesson claimed a jury trial on the issue of his liability on the two notes, above mentioned, and jury issues were framed, as follows: (1) "What amount, if any, does the defendant Israel Nesson now owe the plaintiff on the note executed by him on October 17, 1898, for $80,000?" (2) "What amount, if any, does the defendant Israel Nesson now owe the plaintiff on the note executed by him on June 28, 1917, for $36,000?"

The case came on to be heard before a jury on the foregoing issues. The plaintiff put in evidence the originals of the two notes, copies of which are attached to the bill of complaint, and read to the jury the interrogatories to the defendant Israel Nesson, and his answers whereby he admitted the execution and delivery to the plaintiff of both notes. In said answers he also admitted payment of interest on the note of October 17, 1898, up to November 5, 1932, and payment of the principal to the amount of $8,000; and on the note of June 28, 1917, he admitted payment of interest to June 28, 1932, and that he had not paid any portion of the principal. The plaintiff then rested its case.

The defendants' counsel then, at great length, made an opening statement to the jury which, in substance, was outlined in the amended answer. Following this opening he read to the jury certain interrogatories to an officer of the plaintiff corporation and his answers thereto. No argument is based by the defendant on these interrogatories and answers and no further reference will be made to them. Counsel for the defendants then called the defendant Israel Nesson as a witness and inquired of him as to his transac-

tion with Mr. Howard Stockton in 1926, referred to in the
opening statement of the defendants' counsel; on objection
being taken by counsel for the plaintiff the judge inquired
of counsel for the defendants whether he had any evidence
that went further than this opening statement, and upon
his negative reply counsel for the plaintiff made the follow-
ing motion in writing: "Now comes the plaintiff in the
above entitled cause of action and moves that the court
order and direct the jury to answer in the affirmative the
jury issues submitted to them, to wit: That on issue 1
the defendant, Israel Nesson, owes the plaintiff the sum of
$52,000, and interest in the amount of $1,255.22; and that
on issue 2 the defendant, Israel Nesson, now owes the
plaintiff the sum of $36,000, together with interest in the
amount of $583." The interest thus computed was interest
on the unpaid principal of the respective notes from the
time when the last payment of interest was made to April
13, 1933, the date when the verdict was rendered, at the
rate of five and one half per cent per annum. The judge
allowed the plaintiff's motion and directed the jury to
return a verdict as prayed for and the jury did return such
verdict. The defendants duly excepted. This procedure
was permissible. *Gray* v. *Boston,* 277 Mass. 166, 167. The
case was thereafter tried by the judge sitting in equity,
who made findings of fact establishing the liability of the
defendant Israel Nesson and making provision for reaching
and applying certain property in satisfaction of the debt.
The defendants duly appealed.

The material facts which are to be taken as true, relied
on by the defendants in their opening to the jury, shortly
stated are as follows: In 1898 the defendant Israel Nesson
built an apartment house on St. Botolph Street, Boston,
Massachusetts. In order to finance it he borrowed $80,000
from the Massachusetts Hospital Life Insurance Company,
the plaintiff, and gave to the plaintiff his promissory note
in that amount secured by a first mortgage on the said
apartment house. The note was dated October 17, 1898,
payable in five years from that date "with interest . . .
at the rate of four and one-half per cent. per annum until

this note is paid in full." Nesson soon thereafter sold the mortgaged property, but bought it back in 1915, and has owned it ever since. The mortgage debt had at that time been reduced to $60,000. In 1917 he borrowed the sum of $36,000 from the plaintiff and gave to it his promissory note, in like sum, secured by a mortgage on a parcel of land on St. Botolph Street adjoining the apartment house which he had mortgaged to the plaintiff in 1898. The note of $36,000 was dated June 28, 1917, was payable in three years "with interest to be paid half yearly . . . at the rate of $4\frac{1}{2}$ per cent. per annum and also interest upon all overdue interest at the rate of six per cent. per annum." At the time this suit was begun the principal of the original mortgage debt had been reduced to $52,000, and the later mortgage debt still stood at $36,000. The repurchase by Israel Nesson in 1915 of the apartment house which was subject to the original mortgage was at the solicitation of the plaintiff. The transaction was had with the plaintiff through Mr. Howard Stockton "who held the position of actuary, which is the name that was given to its chief executive officer — it might be that other companies would call it general manager or president — but in that company he is known as the actuary." The defendants' offer of proof discloses that in this transaction Nesson dealt solely with Mr. Stockton, and that Mr. Stockton acted in the matter without seeking authority from any other officers of the company. Counsel for the defendants further offered to show that Nesson had other dealings with the plaintiff "and always, when they were matters of importance, other than merely going in and paying something, he dealt with Mr. Stockton." He further offered to show that in 1926 the defendant Israel Nesson called on Mr. Stockton and "proposed to him that he would make certain improvements and alterations on these [mortgaged] buildings, particularly that he was to throw them together so they could be used as a single building and the elevator in the big building could be used also for the other buildings; that he would make these alterations so that more suites could be used in this apartment house. . . . that he said

to Mr. Stockton that if Mr. Stockton would release him from personal liability on these notes he would go ahead and make these improvements which, he said, would render the security of the mortgage so good that it would be unnecessary to hold him on personal liability on the notes, as long as they could enter at any time and take possession of the property"; and that "Stockton orally agreed if he would make these improvements and pay him $1,000 on account of the principal of the note he would release him from all personal liability on the notes"; that "Thereupon, in reliance on Mr. Stockton's promise he, Mr. Nesson, went ahead and spent over $15,000 of his own money in making these alterations and improvements which he had promised to make, and also paid the Massachusetts Hospital Life Insurance Company the $1,000 that he had promised to pay."

The defendants further offered to prove that some time after this agreement in 1926 a question arose as to the matter of interest. On two occasions, both mortgage debts being long past due and the mortgages subject to be foreclosed or payment in full enforced at any time, the plaintiff increased the rate of interest on the mortgages above the rate prescribed in the notes without any discussion with the defendants about it. The plaintiff simply sent a notice saying "From this date the rate of interest will be five and a half per cent," and "from this date your interest will be five and three quarters per cent." Israel Nesson "at some time asked them if they couldn't give him a lower rate of interest, but they simply sent him a notice . . . that the interest from then on would be five and three quarters or five and a half per cent." Mr. Stockton died within a year or two, and was succeeded by an actuary of the company who had no personal knowledge of these transactions. Until recently no demand was made and no mention was made of any claim of this defendant's liability on the notes. The plaintiff has now "taken possession of the property under the law, and unless the property is redeemed within three years it will become the undisputed owner of this big apartment house and all the mortgaged property."

The opening by the defendants states their contention as follows: "We are contending that on the facts in this case, while it retains and is able to enforce its rights to occupy and sell this apartment house and the other two apartment houses connected with it on St. Botolph Street, that by the agreement with Mr. Stockton and by the action of the company in abandoning the rate of interest which was fixed on the notes without consultation with Mr. Nesson, the defendant, and charging a higher and different rate of interest, it has waived his personal liability on the notes and has limited itself to the seizing and occupying of this property and selling it or using it as it sees fit."

In determining the first defence raised by the defendants it is obvious that the issue is, Has the actuary of an insurance company the authority, merely by virtue of his office, to agree to release from personal liability the maker of two mortgage notes payable to the company upon which there is due the sum of $88,000, in consideration of the mortgagor's agreement to make certain improvements in the mortgaged property and to pay $1,000 on the principal of one of the notes then due?

In the offer of proof it is said, in substance, that the position of the chief executive officer, general manager or president was known as the actuary. It is said of the title general manager, as applied to a corporation, that he may exercise all of the operative functions of the corporation within the field or rules prescribed by the board of directors. It is also said that a manager may be an officer of a corporation whose office signifies general management, such as a president, or one who in fact manages, although holding a subordinate office. "Except for purposes of determining apparent authority, the name of the office held is unimportant; the functions performed with the consent of the principal are determinative." Authority "to manage a business includes authority: (a) to make contracts which are incidental to such business, are usually made in it, or are reasonably necessary in conducting it." Am. Law Inst. Restatement: Agency, § 73. "Unless otherwise agreed, authority to receive payment includes authority:

(a) to receive payment in full in money when the debt is due; and (b) to surrender to the payer any security for or evidence of the debt to which he is entitled and to give him such receipt as it is usual to give. . . . Authority to collect does not include authority to compromise, to release any part of the debt, or to permit a deduction because of an alleged set-off or counterclaim." Am. Law Inst. Restatement: Agency, § 72.

In the instant case there is nothing in the opening to show that Mr. Stockton was given express authority to make the arrangement he did with Israel Nesson. Nor can it be inferred from the fact that Mr. Stockton presumably had authority to collect the notes and discharge the mortgage security that he had authority to make the arrangement he did because such action was necessary to a proper conduct of the business; nor is there any offer to prove that the actuary, in any capacity however named, was accustomed to make such arrangements. *Moshannon Land & Lumber Co.* v. *Sloan*, 109 Penn. St. 532, 534. *Delta Lumber Co.* v. *Williams*, 73 Mich. 86, 95. On the facts offered to be proved there is no room for inference that such an arrangement had ever before been made, much less that it was a customary thing to do, and nothing to warrant an inference that it was necessary so to do. The notes were overdue, but no entry had been made and there is no offer to prove that the defendant Israel Nesson was financially irresponsible. It is settled that an agent or officer of a corporation has not ordinarily authority to cancel or release a contract of his principal which is in force. *Craig Silver Co.* v. *Smith*, 163 Mass. 262, 268. *Hosher-Platt Co.* v. *Miller*, 238 Mass. 518, 523. *Eastern Advertising Co.* v. *Standard Nut Co. Inc.* 264 Mass. 238, 241. *De Blois* v. *Boylston & Tremont Corp.* 281 Mass. 498, 520. We do not think the fact that Stockton acted for the corporation in 1915, when the defendant Israel Nesson repurchased the equity in the mortgaged property, and that he then or later held the position of actuary, and that this defendant had other dealings with the corporation, acting through Mr. Stockton, would warrant a finding that in 1926 Mr. Stockton,

by virtue merely of his office, had ostensible authority to release the defendant from his obligations upon the notes, short of full payment, however adequate the consideration for the release by Mr. Stockton was.

If a contract to pay interest at a higher rate can be inferred from voluntary payment of interest at that rate (*Ellis* v. *Sullivan*, 241 Mass. 60, 64; *Barry* v. *General Mortgage & Loan Corp.* 254 Mass. 282, 287, 288), such a contract cannot be enforced in this suit upon notes which bear interest at a lower rate, without appropriate allegations of agreement for payment of an increased rate of interest. There are no such allegations in the present bill.

It results that the exceptions saved to the action on the notes must be sustained, unless the plaintiff shall remit from the verdict and judgment to be entered on the verdict all interest in excess of four and one half per cent as provided in said notes. If such remittance is made within thirty days from entry of the rescript the exceptions are overruled; if not made, the exceptions are sustained.

*Ordered accordingly.*